# In the United States Court of Federal Claims

No. 20-1411V
Filed under seal: September 4, 2024
Reissued: September 19, 2024[*]
NOT FOR PUBLICATION

**JAMI SHANES,**

        *Petitioner*,

**v.**

**UNITED STATES,**

        *Respondent.*

*Braden A. Blumenstiel*, The Law Office of DuPont & Blumenstiel, Dublin, OH, for the petitioner.

*Matthew Murphy*, Vaccine/Torts Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for the respondent.

## MEMORANDUM OPINION AND ORDER

**HERTLING, Judge**

      The petitioner, Jami Shanes, seeks review of a special master's decision denying her claim under the National Vaccine Injury Compensation Program ("Vaccine Program"), 42 U.S.C. § 300aa *et seq*. Ms. Shanes alleged that an influenza ("flu") vaccine she received on October 18, 2017, caused her to suffer from the Miller-Fisher variant of Guillain-Barré syndrome ("MF-GBS"). The special master denied Ms. Shanes's petition. The special master found that she had failed to establish by preponderant evidence that the symptoms of her alleged vaccine-related injury persisted for at least six months, as required by law to qualify for compensation.

      The petitioner argues that the special master's decision was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law. To support her claim, the petitioner relies on evidence she produced from a July 2018 hospitalization and on affidavits

---

[*] Pursuant to Vaccine Rule 18(b), the Court initially filed this opinion under seal on September 4, 2024, and afforded the parties 14 days to propose any redactions from the opinion for reasons of privilege or confidentiality. The parties did not propose any redactions. Accordingly, this opinion is reissued in its original form for public availability.

from herself and her parents. The petitioner argues that this evidence establishes that, contrary to the special master's decision, her symptoms lasted for longer than six months.

The special master properly considered and addressed the evidence as the finder of fact. He relied on evidence in the record establishing that the petitioner's symptoms lasted through March 2018, less than six full months after her flu vaccine, but not afterwards. Under the applicable standard of review, the special master's appropriate consideration of the evidence and the reasoned basis for his decision are not an abuse of discretion. The petitioner's motion for review is denied.

## I.   FACTUAL BACKGROUND[1]

### A.   Contents of the Record

At the time the petitioner filed her petition, she submitted an affidavit describing her vaccination, the onset of her symptoms, a list of medical providers she saw about her condition, and the physical limitations that she experienced and attributed to her MF-GBS symptoms. (ECF 1-1 at 1-2.) In addition, during the proceedings, the petitioner submitted medical records (ECF 6; ECF 8; ECF 43-2; ECF 47), three supplemental affidavits on her own behalf (ECF 21-1; ECF 37-1; ECF 43-1), and affidavits from her parents (ECF 34-1; ECF 34-2; ECF 39-1).

### B.   Vaccination and Onset of Symptoms

Ms. Shanes received a flu vaccine on October 18, 2017. (*Decision* at 5.) She began to experience symptoms soon thereafter, and on November 6, 2017, went to an urgent care center, where she reported symptoms of "bilateral earache, mild congestion, a dry cough, headache, and sore throat." (*Id.*) Records from the visit reflect that the petitioner reported she had "swollen glands about five days ago, no longer has sore throat, now has headache and ear congestion and facial fullness." (*Id.*) That same month, the petitioner reported symptoms of vertigo. On November 13, 2017, she had a neurological exam with Dr. Amelita Quedding-Pizarro, who observed that the petitioner's pupils were dilated, and she had an unsteady gait. (*Id.*) Dr. Quedding-Pizarro referred the petitioner to the emergency department, where a neurological exam showed she was "positive for dysmetria, truncal ataxia, [and] ataxic gait." (*Id.*) The petitioner was so unsteady that she could not complete a basic mobility test. (*Id.*)

The petitioner's symptoms persisted in the days following her emergency visit, and she had an appointment with an ear, nose, and throat specialist ("ENT") on November 16, 2017. (*Id.* at 6.) She complained that her dizziness had been ongoing for the past four weeks, and the ENT reported the petitioner had a "deconjugated gaze, an abnormal Romberg test, an abnormal gait,

---

[1] This recitation of the facts underlying the petitioner's claim is drawn from the special master's decision (ECF 53), cited as "*Decision*." Internal citations are omitted. Neither party disputes the special master's findings as to the facts underlying the claim; the petitioner challenges the special master's inferences and conclusions drawn from the evidence.

and bilateral dysdiadochokinesia." (*Id.*)  The ENT referred Ms. Shanes to a neurologist, Dr. Norton Winer, who saw her that same day. (*Id.*)  After observing her, Dr. Winer noted that the petitioner's symptoms were "most consistent with Miller Fisher variant of Guillain-Barré syndrome.  She has plateaued neurologically and I think it is safe to manage her as an outpatient." (*Id.*)

The petitioner had follow-up visits with Dr. Winer on November 21 and December 12, 2017, and on March 15, 2018. (*Id.* at 6-7.)  At the November appointment, the petitioner reported that her balance had improved, and the double vision had lessened. (*Id.* at 6.)  In December, Dr. Winer observed that Ms. Shanes's gait was greatly improved, and she indicated she was having "no problems with balance and no problems with walking." (*Id.*)  The petitioner still reported having double vision and paralysis of her left eye. (*Id.*)  Dr. Winer's neurological tests confirmed these symptoms, and the petitioner was advised to see a neuro-ophthalmologist.  At the March 2018 appointment, the petitioner denied having any problems walking.  Dr. Winer noted that Ms. Shanes "ha[d] made almost a full recovery" and a "posterior full recovery from Guillain-Barré syndrome." (*Id.* at 7.)

On March 29, 2018, the petitioner had an appointment with a neuro-ophthalmologist, Dr. Michael Morgan. (*Id.*)  Dr. Morgan noted that the petitioner's "diplopia has resolved, and examination now is remarkable only for light near dissociation of the pupils, possibly residual parasympathetic/CN III damage versus a normal variant."[2] (*Id.*)  Dr. Morgan recommended a follow-up visit if the diplopia recurred. (*Id.*)  The record does not reflect that the petitioner ever had a follow-up visit to Dr. Morgan.

The next medical visit in the record indicates that the petitioner saw a chiropractor for treatment of a "sprain[ed] sacroiliac joint, low back pain, muscle spasm of the back, and cervicalgia" from June 19 to July 17, 2018. (*Id.*)  The special master found that the chiropractor's records did "not include any reports of dizziness, difficulty walking, balance issues, or twitching." (*Id.* at 8.)

During the time she was seeing the chiropractor, the petitioner was briefly hospitalized from July 5-9, 2018, for cellulitis on her right arm after having had a mole removed. (*Id.*)  The records from this visit include a full review of her symptoms, including those unrelated to the cellulitis.  The hospital records indicated that the petitioner's "cornea and anterior were clear," and that she had "normal sensation, no focal weakness, and no focal/lateralized findings either." (*Id.*)  The attending hospital physician, Dr. Mark Salomone, noted that the petitioner was "negative for blurry vision, diplopia, or vision/loss or change." (*Id.*)

On July 5, 2018, the date Ms. Shanes was admitted to the hospital for the cellulitis, Dr. Tracy Lemonovich, another doctor who treated Ms. Shanes at the hospital, took a medical history.  In the section of the petitioner's hospital record titled "Past Medical History," Dr.

---

[2] Diplopia is "the perception of two images in a single object; called also . . . double vision." *Dorland's Illustrated Medical Dictionary* 518 (33rd ed. 2020).

Lemonovich noted "[Guillain]-Barré syndrome attributed to influenza vaccine 11/2017, has some residual intermittent diplopia." (*Id.* at 8.) The July 9, 2018, discharge record from the same hospitalization included a "problem list" of the petitioner's conditions. That list noted as "active conditions" "[s]equelae of Guillain Barre syndrome," as well as other conditions such as cellulitis, leukocytosis, sepsis, anxiety disorder, and major depressive disorder. (ECF 47-1 at 19-20.) Notably, the list included no "inactive" conditions.

In the months following the hospitalization, the petitioner did not report experiencing any of the symptoms previously associated with her MF-GBS. At a follow-up visit with Dr. Lemonovich on July 20, 2018, the petitioner reported having no vision problems or limb weakness; the petitioner indicated she was using the treadmill, cycling, and weight training. (*Decision* at 8.) At a September 24, 2018, appointment with Dr. Quedding-Pizarro, the petitioner "denied dizziness and muscle aches or joint pains." (*Id.*) Dr. Quedding-Pizarro's record of that visit noted that the petitioner's "extra ocular movements were intact, and her neurological examination indicated that petitioner was alert, oriented, cranial nerves II-XII intact except for visual acuity." (*Id.*) The petitioner's gait was reported to be "normal and steady." (*Id.*)

At her next visit with Dr. Quedding-Pizarro, on August 16, 2019, Ms. Shanes "indicated for the first time that she was experiencing extreme fatigue." (*Id.*) She reported no dizziness or headaches and had a steady gait and a full range of motion in her limbs. (*Id.*) Dr. Quedding-Pizarro ordered a blood test. When Dr. Quedding-Pizarro next saw her on October 18, 2019, Ms. Shanes reported that she was "doing better" but still occasionally became "sleepy sometimes when driving." (*Id.*) She was diagnosed with low vitamin D, and the doctor recommended a supplement. (*Id.* at 9.)

The final medical record the petitioner filed was from a preventative-healthcare appointment in September 2023. (*Id.*) The record of this appointment reflects that the petitioner still had low vitamin D levels, cranial nerves that were "intact except for visual acuity," and a "normal and steady gait." (*Id.*)

The petitioner filed four affidavits on her own behalf. Each of them reports facts consistent with the special master's findings, summarized above. Her first affidavit, submitted concurrently with her complaint, describes her vaccination, the onset of her symptoms, the providers she has seen to treat her symptoms, and the present physical limitations that she attributes to the vaccine. (ECF 1-1.) Reporting on her present symptoms, Ms. Shanes averred that due to her MF-GBS diagnosis, she "continue[s] to experience chronic fatigue, intermittent nerve pain, and twitching at night." (ECF 1-1 at 2.) She further asserted that she cannot go down the stairs alone and requires assistance to do everyday activities. (*Id.*) The next affidavit, signed May 1, 2021, is identical to the first affidavit other than two lines in which Ms. Shanes reports that she is not married and has no children. (ECF 21-1 at 1.) In her November 8, 2023, affidavit, she reported experiencing chronic fatigue, balance issues, and pain in her neck and lower body. (ECF 37-1 at 2.) The petitioner's January 18, 2024, affidavit offers the most detail. It explains that she "cannot stand for longer than 30 minutes without taking a break," has "no reflexes," and "still suffer[s] from blurry vision, double vision, reflex issues, and poor muscle control." (ECF 43-1 at 3.)

4

In addition to her own affidavits, the petitioner submitted affidavits from her parents. Each parent signed a separate, but identical, affidavit on March 15, 2023. (ECF 34-1; ECF 34-2.) The affidavits incorrectly state that the petitioner received the flu vaccine on October 17, 2018, instead of the correct October 18, 2017. (ECF 34-1 at 1; ECF 34-2 at 2.) Reviewing their daughter's symptoms, her parents state that, following the vaccination, they "personally observed" Ms. Shanes develop "a) loss in vision; b) difficulty walking; c) fatigue; and d) vertigo." (ECF 34-1 at 1; ECF 34-2 at 1.) In a second, joint affidavit filed on November 16, 2023, the petitioner's parents restated verbatim the symptom information provided in the petitioner's November 8, 2023, affidavit. (ECF 39.) The petitioner's parents aver that they could confirm all the petitioner's symptoms "based on [their] personal knowledge and observations." (*Id.* at 1.)

## II.   PROCEDURAL HISTORY AND THE SPECIAL MASTER'S DECISION

The petitioner filed her claim in October 2020, alleging that the flu vaccine she received on October 18, 2017, caused her to develop MF-GBS. (ECF 1 at 1.)

Following factual development as described at the outset of Section I of this opinion, the special master issued a decision on June 21, 2024, dismissing the petitioner's claim. Evaluating her claim against the Vaccine Injury Table criteria, the special master found that there was "no doubt" the petitioner was diagnosed with MF-GBS by Dr. Winer on November 16, 2017, and that the petitioner began to experience the symptoms of her condition "after receipt of vaccination." (*Decision* at 10.) With the table-injury criteria established, the special master determined that the "only factual issue [was] whether petitioner's symptoms or residual problems attributable to GBS continued for longer than six months." (*Id.*) For a claim to be compensable under the Vaccine Program, the symptoms must last for longer than six months. 42 U.S.C. § 300aa-11. The special master found that the petitioner's symptoms did not meet this requirement. (*Decision* at 11.)

The special master determined that the record established the petitioner's MF-GBS symptom onset occurred "by November 13, 2017," the day of her initial neurological exam with Dr. Quedding-Pizarro. (*Id.*) The record of that visit established her MF-GBS symptoms as "ataxia, balance issues, double vision (diplopia), dysmetria, and areflexia." (*Id.*) With this onset date, the petitioner needed to demonstrate by preponderant evidence that she suffered "ongoing symptoms or residual deficits through at least May 13, 2018." (*Id.*)

The special master found that the last time at which the petitioner's medical records indicate she suffered from MF-GBS symptoms was in March 2018. At her final appointment with Dr. Winer on March 15, 2018, the doctor's records noted that the petitioner had no issues walking and had made a "posterior full recovery from GBS syndrome." (*Id.*) As to the petitioner's intermittent double vision, Dr. Winer referred the petitioner to Dr. Morgan, a neuro-ophthalmologist. (*Id.*) At the petitioner's visit on March 29, 2018, Dr. Morgan observed that the petitioner's double vision had resolved and instructed her to schedule a follow-up appointment if she experienced continuing or additional symptoms.

The special master determined that the petitioner's March 29, 2018, visit with Dr. Morgan was the final medical record in which any of the petitioner's MF-GBS symptoms were noted; the petitioner neither filed records of any later visits with Dr. Winer or Dr. Morgan nor reported seeing any other specialists who could have documented that she experienced MF-GBS symptoms after her visit to Dr. Morgan on March 29, 2018.  (*Id.*)

Based on the medical records, the special master found that the petitioner's MF-GBS symptoms had ceased by the end of March, and the petitioner therefore did not establish that her symptoms had persisted for the statutorily required period.  (*Id.* at 16.)  The petitioner moved for review of the special master's decision on July 17, 2024.  (ECF 54.)  The respondent filed its opposition to the motion on August 19, 2024.  (ECF 56.)  Oral argument was held on September 3, 2024.

### III.    JURISDICTION AND STANDARD OF REVIEW

The Court of Federal Claims has jurisdiction to review the decisions of special masters under the Vaccine Program.  42 U.S.C. § 300aa-12(e).  Pursuant to this jurisdiction, the court may "set aside any findings of fact or conclusion of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law."  42 U.S.C. § 300aa-12(e)(2)(B); *see also* Rule 27(b), Appendix B to the Rules of the Court of Federal Claims ("RCFC").

A petition for review of a special master's decision places a judge of the Court of Federal Claims "in the role of a reviewing judge."  *Munn v. Sec'y of Dep't of Health & Hum. Servs.*, 970 F.2d 863, 869 (Fed. Cir. 1992).  That role does not involve second-guessing the special master's fact-intensive conclusions.  S*ee Hodges v. Sec'y of Dep't of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993).  The reviewing court does not "reweigh the factual evidence" or "assess whether the special master correctly evaluated the evidence."  *Porter v. Sec'y of Dep't of Health & Hum. Servs.*, 663 F. 3d 1242, 1249 (Fed. Cir. 2011).

The Federal Circuit has described the standard of review as "the most deferential possible."  *Munn*, 970 F.2d at 870.  A court "owes [the] findings and conclusions by the special master great deference—no change may be made absent first a determination that the special master was 'arbitrary and capricious.'"  *Id*.  The degree of deference depends on which aspect of the special master's judgment is under review.  *Id*. at 870 n.10.  A court "may set aside the decision of a special master only if the special master's fact findings are arbitrary and capricious, its legal conclusions are not in accordance with law, or its discretionary rulings are an abuse of discretion."  *Turner v. Sec'y of Health & Hum. Servs*., 268 F.3d 1334, 1337 (Fed. Cir. 2001).  It is "extremely difficult" to establish error and overturn a special master's factual findings if the special master has "considered the relevant evidence of the record, drawn plausible inferences and articulated a rational basis for the decision."  *Hines on Behalf of Sevier v. Sec'y of Dep't of Health & Hum. Servs.*, 940 F.2d 1518, 1528 (Fed. Cir. 1991).

## IV.     DISCUSSION

In her motion for review, the petitioner argues that, in finding she had failed to prove by preponderant evidence that her symptoms had lasted for more than six months, the special master's decision is arbitrary, capricious, and an abuse of his discretion. (ECF 54 at 2.) The petitioner argues that the special master improperly discounted the evidence from her July 2018 hospitalization and from the affidavits. At oral argument, the petitioner focused on the July 9 hospital-discharge record. The notation on the "problem list" included in the discharge record listed the petitioner's GBS as "active." The petitioner argued that this notation proved that Ms. Shanes's symptoms had persisted for more than six months.

The respondent argues that, given the deference due to the special master's decision, the petitioner's motion for review should be denied. (ECF 56 at 5.) The special master's decision reflects a review and consideration of all the evidence submitted by the petitioner, including the records from her July 2018 hospitalization and her affidavits. Therefore, the respondent argues, the petitioner has failed to demonstrate that the special master committed reversible error, and the Court of Federal Claims may not reweigh the evidence to overturn his findings.

### A.     The July 2018 Hospitalization Records

The petitioner argues that the special master acted arbitrarily and capriciously in his examination of the petitioner's hospital records from July 2018. First, she argues that the special master should have found that Dr. Lemonovich's note of July 5, 2018, established that her MF-GBS symptoms had persisted into July. The petitioner argues that "Dr. Lemonovich declared petitioner was experiencing 'Gu[i]llain-Barré Syndrome attributed to influenza vaccine 11/2017, has some residual intermittent diplopia.'" (ECF 54 at 4.) Second, she contends that the discharge report containing a "problem list" of Ms. Shanes's conditions demonstrates that her MF-GBS was "active" during her hospitalization. (ECF 54 at 4; *see also* ECF 47-1 at 19.)

First, the petitioner's argument about Dr. Lemonovich's notation mischaracterizes the record. The special master's recitation of the facts explained that Dr. Lemonovich did note the petitioner's history of Gu[i]llain-Barré syndrome. Dr. Lemonovich did not, however, note that the petitioner was "experiencing" symptoms of the illness on July 5. Instead, Dr. Lemonovich included his reference in the section of the petitioner's medical record titled "Past Medical History." Dr. Lemonovich did employ the present tense in referring to the fact that the petitioner "has some residual intermittent diplopia" in the context of the petitioner's medical history. The discrepancy between the use of the present tense and the reference appearing in the medical-history section of the record is one for the special master to resolve; the special master did so. In the context of the reference being in the medical-history portion of the record, the special master found that the "lone notation from Dr. Lemonovich . . . is not sufficient to meet the six-month severity requirement on its own." (*Decision* at 12.)

The special master's decision regarding this evidence reflects careful analysis. First, he noted that MF-GBS was not the condition for which Dr. Lemonovich was treating the petitioner; the petitioner was hospitalized and receiving treatment for cellulitis related to the removal of a mole. (*Id.*) Second, he noted that Dr. Lemonovich did not test the petitioner's vision. (*Id.*)

7

Third, the special master explained that Dr. Lemonovich had declined to provide an expert report addressing whether the petitioner's alleged MF-GBS symptoms were active during the hospitalization because she was not the treating physician for that condition. (*Id.* at 4.) Finally, reading the note in the context of the petitioner's complete medical record, the special master explained that "the report of residual intermittent double vision . . . [which] was likely just a notation of a history provided by petitioner, directly contradicts petitioner's other statements to physicians and nurses during that same hospitalization that she *did not* have diplopia." (*Id.* (emphasis original).)

In the face of the ambiguous reference in the July 5 medical record, the special master carefully analyzed the context of the reference and rendered a reasoned decision in which he opted to credit the other medical evidence in the record, rather than simply accepting the accuracy of the "lone notation" in the record made during a hospitalization for an unrelated condition when that notation was contrary to other contemporaneous records.

As to the July 9 discharge record (ECF 47-1 at 19-20), the special master failed to discuss this reference. Nonetheless, the listing of GBS as "active" on the petitioner's hospital-discharge "problem list" does not establish that the petitioner's symptoms persisted beyond six months; it was not an abuse of the special master's discretion to omit a substantive discussion of that record in his decision.

There are several features of the discharge-record problem list that make it non-definitive as to the conditions the petitioner was actively experiencing at the time of her discharge. First, the problem list appears to be simply an auto-generated list produced by the hospital's administration and neither signed nor otherwise verified by any of Ms. Shanes's attending physicians. All the petitioner's conditions included on the problem list, with the exception of the cellulitis, leukocytosis, and sepsis for which the petitioner was being treated during her July 2018 hospitalization, are listed with an "onset date" of July 9, 2018.[3] At least as to the petitioner's MF-GBS, this onset date cannot be correct, because every other piece of evidence in the record reflects that the onset of Ms. Shanes's MF-GBS occurred in the weeks immediately following her October 2017 vaccination. Indeed, it seems highly improbable that Ms. Shanes could have simultaneously developed all of the conditions listed on the chart on July 9 and have been discharged on that same day. Additionally, each condition listed has an "entered date" of July 14, 2018. From this latter fact, it is obvious that this document could not have been generated on July 9 when the petitioner was discharged from the hospital.

---

[3] In full, the conditions listed are cellulitis, leukocytosis, sepsis, methicillin susceptible to staphylococcus aureus infection, constipation, sequelae of Guillain-Barré syndrome, diplopia, anxiety, major depressive disorder with single episode, cellulitis of right upper extremity, infection following procedure, and postoperative and post-traumatic infections. Additional notations to sepsis appear on the chart with an onset date of July 9, 2018, when she was admitted for treatment of that condition, and others, on July 5, 2018.

In addition, the notation reflecting an "active" status for each of the petitioner's listed conditions conflicts with the actual observations of her treating physicians during the hospitalization. The special master relied on these observations, made by the petitioner's treating physicians and reflected in their contemporaneous notes, in reaching his decision.[4]

Although the special master did not specifically address the discharge-report's "problem list" in his decision, his careful consideration of the medical notes made by the petitioner's treating physicians during her hospitalization remains adequate to support his decision. The special master cited the observations of three physicians who treated Ms. Shanes during her hospitalization: on July 5, 2018, Dr. Salomone (*id.* at 99), Dr. Donald Spaner (*id.* at 87), and Dr. Lemonovich (*id.* at 106-107) each affirmatively reported that the petitioner was not actively experiencing any double vision or visual disturbances. Moreover, their reports did not note any other active symptoms of MF-GBS during the petitioner's hospitalization. These reports reflect first-hand observations by physicians of the petitioner's condition during her hospitalization. The special master did not abuse his discretion in choosing to base his decision on these reports instead of the discharge report apparently generated by the hospital's computer system and not attested by any medical professional.

The special master's reasoned decision concluding that Dr. Lemonovich's July 5, 2018, notation did not establish the petitioner's MF-GBS symptoms lasted longer than six months is not arbitrary or capricious. Although the special master omitted a detailed discussion of the petitioner's discharge report, his consideration of the hospitalization record as whole adequately supported his conclusion.

### B.     The Petitioner's Affidavits

The petitioner next argues that the special master improperly failed to give adequate weight to her October 16, 2020, affidavit and her parents' March 15, 2023, affidavits. (ECF 54 at 4-5.)

In her own sworn statement, the petitioner asserted that "[a]s a result of the [flu] vaccine [she] received on October 18, 2017, [she] cannot do normal everyday activities without assistance, cannot cook on [her] own, [and] cannot go down the stairs alone." (ECF 1-1 at 2.)

---

[4] The term "active" on the "problem list" appears to be a by-product of the list's autogenerated status. For example, it seems unlikely that the petitioner's sepsis and cellulitis were truly "active" at the time of her discharge; those conditions were the reasons for her hospitalization. Likewise, the petitioner's "major depressive disorder with single episode" was also listed as "active," yet none of the treating physicians during the hospitalization mentioned any depressive episode. Both these notations, like the notation of the petitioner's GBS, seem to reflect cumulative listings of any conditions from which the petitioner had suffered at some point and were never cleared from her medical record or marked as resolved.

The plaintiff argues that this affidavit is sufficient to prove that her "symptoms lasted for years longer than the required six months." (ECF 54 at 4.)

The petitioner also relies on different portions of each parent's affidavit in support of her motion, but the language from each parent on which she relies is the same in substance and nearly copies the other verbatim. (*See* ECF 34-1 (Peter Shanes); ECF 34-2 (Lisa Shanes).) The affidavits aver that both of Ms. Shanes's parents observed that "prior to October 17, 2018 [sic], Jami Shanes was able to engage in the following types of activities on a regular basis: exercising, walking, cooking, household chores," and that her symptoms included "loss of vision, difficulty in walking, fatigue, vertigo, twitching in her extremities." (ECF 54 at 5 (quoting ECF 34-1 at 1-2; ECF 34-2 at 1-2).) Both parents averred that "[s]ince the vaccination and the subsequent health related difficulties, Jami Shanes is now faced with emotional and physical limitations." (*Id.*)

The special master's decision demonstrates a careful consideration of all the affidavits submitted by the petitioner. In fact, the special master considered the very quotes the petitioner now argues were overlooked: the decision acknowledges the affidavits' descriptions of the petitioner's physical limitations, her symptoms, and her claimed inability to partake in activities she enjoyed prior to the vaccination. (*See Decision* at 14.) The special master concluded, however, that the affidavits' temporally imprecise assertions "stand in stark contrast to what [the petitioner] was reporting to her treating physicians more proximately to her diagnosis." (*Id.*)

The special master's examination of the affidavits and his conclusion that they conflicted with the petitioner's medical records had a rational basis.[5] The special master went further and explained his decision by identifying specific pieces of medical evidence that he found to be more probative than the affidavits. He explained that the petitioner's statement that she could not use the stairs or cook without assistance conflicted with Dr. Winer's March 15, 2018, notation in the medical record that the petitioner "denies any problems with walking or ambulation." (*Id.*) The special master noted that the petitioner's recovery from MF-GBS has remained stable, as her October 2019 records reflect that the petitioner was "exercising 5-6 times a week," and the most recent record from September 2023 indicated that the petitioner had a "normal, steady gait and . . . full range of motion in her extremities." (*Id.*)

After a thorough comparison of the medical records and the affidavits, the special master concluded that "at best, her affidavits exaggerate her initial symptoms and then attempt to tie in unrelated issues, such as fatigue which was diagnosed two years later and associated with a Vitamin D deficiency, to meet the severity requirement." (*Id.*) This conclusion is based on a

---

[5] *See United States v. U.S. Gypsum Co.*, 333 U.S. 364, 396 (1948) ("where [subsequent] testimony is in conflict with contemporaneous documents we can give it little weight, particularly when the crucial issues involve mixed questions of law and fact"). The Federal Circuit has applied this principle in vaccine-injury cases. *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993) ("oral testimony in conflict with contemporary documentary evidence deserves little weight").

10

detailed weighing of the evidence.  The special master considered the affidavits in the context of other evidence submitted by the petitioner, noted that the affidavits conflicted with other, more temporally specific medical records, and connected the symptoms described in the affidavits to other causes noted in the petitioner's record.  The special master's evidence-based conclusion was not an abuse of discretion, and therefore a reviewing court may not disturb the special master's weighing of the evidence.

## V. CONCLUSION

The special master appropriately assessed the evidence submitted by the petitioner to conclude that her MF-GBS symptoms did not persist for the statutorily required six months.  It was not arbitrary and capricious to decide that the evidence establishing that the petitioner's MF-GBS symptoms had resolved by the end of March 2018 outweighed the lone record notation that acknowledged the petitioner's past condition in July 2018, the unattested discharge record, and the affidavits submitted by the petitioner and her parents contradicting the contemporaneous medical records.

Accordingly, the special master's decision is sustained, and the petitioner's motion for review (ECF 54) is **DENIED**.  The Clerk is **DIRECTED** to enter judgment for the respondent.

It is so **ORDERED**.

s/ Richard A. Hertling
**Richard A. Hertling**
**Judge**