# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
Filed: June 21, 2024

```
*  *  *  *  *  *  *  *  *  *  *  *  *
JAMI SHANES,                          *
                                      *
                Petitioner,           *          No. 20-1411V
                                      *
v.                                    *          Special Master Gowen
                                      *
SECRETARY OF HEALTH                   *
AND HUMAN SERVICES,                   *
                                      *
                Respondent.           *
*  *  *  *  *  *  *  *  *  *  *  *  *
```

*Braden A. Bluemstiel,* The Law Office of DuPont & Bluemnstiel, Dublin, OH, for petitioner.
*Matthew Murphy,* U.S. Dept. of Justice, Washington, D.C., for respondent.

## <u>FINDING OF FACT AND DISMISSAL DECISION[1]</u>

On October 19, 2020, Jami Shanes ("petitioner") filed a claim in the National Vaccine Injury Compensation Program[2] alleging that the influenza ("flu") vaccine she received on October 18, 2017 caused her to suffer Miller-Fisher syndrome, a variant of Guillain-Barré syndrome. Petition at Preamble (ECF No. 1). After a review of the evidence, I find that petitioner has not established by preponderant evidence that she experienced residual symptoms of her alleged-vaccine related injury for at least six months and therefore, the petition is hereby **DISMISSED.**

---

[1] Pursuant to the E-Government Act of 2002, *see* 44 U.S.C. § 3501 note (2012), because this opinion contains a reasoned explanation for the action in this case, I am required to post it on the website of the United States Court of Federal Claims. The court's website is at http://www.uscfc.uscourts.gov/aggregator/sources/7. **This means the opinion will be available to anyone with access to the Internet.** Before the opinion is posted on the court's website, each party has 14 days to file a motion requesting redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). "An objecting party must provide the court with a proposed redacted version of the decision." *Id.* **If neither party files a motion for redaction within 14 days, the opinion will be posted on the court's website without any changes.** *Id.*

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-1 to -34 (2012) (Vaccine Act or the Act). All citations in this decision to individual sections of the Vaccine Act are to 42 U.S.C.A. § 300aa.

## I.    Procedural History

In addition to filing her petition on October 19, 2020, petitioner also filed medical records and an affidavit. *See* Petitioner's Exhibits ("Pet. Exs.") 2, 5, 6-15 (ECF Nos. 8, 14, 20). Additionally, petitioner filed affidavits from her parents, Mr. Peter Shanes and Mrs. Lisa Shanes. Pet. Exs. 20 & 21. This case was reassigned to my docket on November 16, 2021. On May 2, 2022, respondent filed a status report indicating that there were several medical records missing, including records that pre-dated the vaccination at issue. Respondent ("Resp.") Status Report (ECF No. 28). In response, petitioner filed a status report on July 20, 2022 stating that all medical records related to her pre-vaccination history have been filed as Exhibit 12 and that no additional records exist. Pet. Status Rept. (ECF No. 29).

On December 6, 2022, respondent filed the Rule 4(c) report recommending against compensation. Resp. Report ("Rept."). Respondent stated that the Division of Injury Compensation Programs reviewed petitioner's medical records and petition and determined that petitioner did satisfy the criteria set forth in the Vaccine Injury Table and the Qualification and Aids to Interpretation for a flu/GBS-Miller Fisher variant Table Injury. Resp. Rept. at 7; *see also* 42 C.F.R. § 100.3(a)(XIV)(D); 42 C.F.R. § 100.3(c)(15). However, respondent argued that the records do not establish by preponderant evidence that petitioner's condition persisted for at least six months and thus is ineligible for compensation. *Id.* at 7. Respondent stated that petitioner must demonstrate that her symptoms of the MFS-GBS lasted at least until May 13, 2018, but that the records indicate that she had fully recovered by March 2018 and that the fatigue she was alleging to be related to her MFS-GBS was actually related to a low vitamin D level, not the MFS-GBS. *Id.* at 8.

The undersigned held a status conference on October 5, 2023, during which I ordered petitioner to file supplemental affidavits from her parents, as the initial affidavits included many errors, including the incorrect vaccination date and the onset of petitioner's symptoms. Scheduling Order (ECF No. 36). Further, I agreed with respondent's assessment that the records do demonstrate that petitioner had suffered MFS-GBS, however, the medical records do not demonstrate by preponderant evidence that she suffered residual symptoms of her MFS-GBS for six months. *Id.* at 3. Furthermore, I indicated that it was unclear which symptoms petitioner was asserting were residual of her MFS-GBS. *Id.* In accordance with the Scheduling Order, petitioner filed a supplemental affidavit and a supplemental affidavit from her parents, Lisa and Peter Shanes. Pet. Exs. 19& 23 (ECF No. 39).

In petitioner's supplemental affidavit, petitioner stated that because of her MFS-GBS, she continued to experience chronic fatigue, intermittent nerve pain, and twitching at night when trying to fall asleep. Pet. Ex. 22 at ¶ 10. Petitioner stated that she cannot sustain doing normal household chores such as cooking and cleaning without having to take breaks, she has pain in her neck and back, and struggles with balance issues. *Id.* at ¶ 11. Additionally, petitioner claims that she was experiencing "uncontrollable twitching" which is caused by the fatigue brought on by the MFS-GBS. *Id.* at ¶ 14. Further, the affidavit states that petitioner has "absent reflexes which have been documented in every yearly check-up that I have had since being diagnosed with GBS in November 2017." *Id.* at ¶ 16. In petitioner's parents' supplemental affidavit, Mr. Peter and Mrs. Lisa Shanes wrote that the information provided in the affidavit was from petitioner and

that they were in agreement with the information provided by the petitioner.  Pet. Ex. 23 at ¶ 2.  The supplemental affidavit from Mr. Peter Shanes and Mrs. Lisa Shanes does not provide any additional information and simply parrots what was in petitioner's supplemental affidavit.

Respondent filed a status report on December 7, 2023, stating that respondent's position has not changed based on the supplemental affidavits and that petitioner still has not established by preponderant evidence that she has experienced six-months of residual symptoms of her MFS-GBS.  Resp. Status Report (ECF No. 40).

On December 7, 2023, I held another status conference to discuss the ongoing issue in petitioner's case and how best to proceed.  Scheduling Order (ECF No. 42).  I explained that the special masters are prohibited from making a finding of entitlement based on the claims of petitioner alone, unsubstantiated by the medical records, or by medical opinion, and that in order for petitioner to demonstrate that she experienced six-months of residual symptoms, she will need to either show in the medical records or by medical opinion that she had symptoms past May 2018.  *Id.*  Failing that, petitioner was instructed to file a motion for a voluntary dismissal, or I would issue an order to show cause.  *Id.*

On January 18, 2024, petitioner filed another supplemental affidavit, which was the exact same as the one previously filed and medical records from her primary care physician.  Pet. Exs. 24 & 25.  The updated medical records came from an appointment with petitioner's primary care physician, Dr. Amelita Quedding-Pizarro on September 15, 2023, when it was observed that petitioner had full motor strength (5/5) and her deep tendon reflexes were symmetrical at 3+.  Petitioner's pupils were equally reactive to light and accommodation and her gait was reported as "normal steady."  Petitioner also filed a motion for extension of time to file updated medical records and an expert report from her treating physician to "help clarify the issue of how long her symptoms lasted."  Pet. Motion for Extension of Time (ECF No. 44).  The undersigned granted petitioner's motion.  *See* Order (ECF No. 45).

Petitioner filed additional medical records on February 22, 2024, and these records were from Ahuja Medical Center.  Pet. Ex. 26.  Petitioner also filed a motion for extension of time to file an expert report, explaining that she had requested expert reports from Dr. Amelita Quedding-Pizarro and Dr. Lori Christian, but they declined.  Pet. Mot. for Extension of Time (ECF No. 46).  Petitioner stated that she was going to request an expert report from Dr. Lemonovich, an infectious disease specialist who was treating her for cellulitis.  *Id.*  I granted petitioner's motion, ordering petitioner to file an expert report from a treating physician by March 27, 2024.

Petitioner again did not file an expert report or letter from any treating physician and instead filed a third motion for extension of time, this time stating that the notation written from Dr. Lemonovich is sufficient to demonstrate that petitioner's symptoms lasted six-months and that petitioner had been unable to locate Dr. Lemonovich to request her to write a report or letter.  Pet. Mot. for Extension of Time (ECF No. 49).  Petitioner stated that if she has been unable to obtain a report from Dr. Lemonovich, she would retain an independent expert and file it in thirty days.  *Id.*  I granted petitioner's third extension of time, stating that if petitioner does not produce

additional evidence to demonstrate that she had six-months of residual symptoms, I will issue a ruling on this fact matter.

Petitioner filed a status report on April 26, 2024, stating that the notation from the medical record from July 5, 2018 is sufficient to show that petitioner continued to experience double-vision symptoms past May 2018, which satisfies the six-month required time period.  Pet. Status Report (ECF No. 51).  Petitioner also stated that Dr. Lemonovich declined to provide an expert report, as she was not the diagnosing physician.  *Id.*  No report from any other expert was filed either.

Accordingly, this matter is ripe for adjudication.

## II.    Relevant Legal Standard

As a preliminary matter, to be eligible for compensation under the Vaccine Act, a petitioner must demonstrate that she has "suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine…or suffered such illness, disability, injury, or condition from the vaccine which resulted in inpatient hospitalization and surgical intervention."  42 U.S.C. § 300aa-11(c)(1)(D)(i)-(iii) ("severity requirement").  Like other elements of petitioner's proof, the severity requirement must be established by a preponderance of the evidence.  *See* § 300aa-13(a)(1)(A); *see also Song v. Sec'y of Health & Human Servs.,* 31 Fed. Cl. 61, 65-66 (1994), *aff'd* 41 F.3d 1520 (Fed. Cir. 2014) (noting that petitioner must demonstrate the six-month severity requirement by a preponderance of the evidence).

A petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence."  *Moberly v. Sec'y of Health & Human Servs.,* 592 F.3d 1315, 1322, n.2 (Fed. Cir. 2010).  Finding that petitioner has met the severity requirement cannot be based on petitioner's word alone, though a special master need not base their finding on medical records alone.  *See* § 300-13(a)(1)); *see also Colon v. Sec'y of Health & Human Servs.,* 156 Fed. Cl. 534, 541 (2021).

The process for making determinations in the Vaccine Program cases regarding factual issues begins with analyzing the medical records, which are required to be filed with the petition. § 300aa-11(c)(2).  Medical records created contemporaneously with the events they describe are generally considered to be more trustworthy.  *Cucuras v. Sec'y of Health & Human Servs.,* 993 F.2d 1525, 1528 (Fed. Cir. 1993).  While medical records are not presumed to be complete and accurate, medical records while seeking treatment are generally afforded more weight than statements made by petitioner after the fact.  *See Gerami v. Sec'y of Health & Human Servs.*, No. 12-442V, 2013 WL 5998109, at *4 (Fed. Cl. Spec. Mstr. Oct. 11, 2013) (finding that contemporaneously documented medical evidence was more persuasive than the letter prepared for litigation purposes), *mot. for rev. denied,* 127 Fed. Cl. 299 (2014).  Further, medical records may not be accurate and complete as to all the patient's physical conditions.  *Kirby v Sec'y of Health & Human Servs.,* 997 F.3d 1378, 1383 (Fed. Cir. 2021) (explaining that a patient may not report every ailment, or a physician may enter information incorrectly or not record everything he or she observes).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Lowrie*, at *19. The United States Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate." *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998). The Court later outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

### III.    Factual Record

#### a.    Petitioner's medical records

Petitioner received the flu vaccine on October 18, 2017, at her place of employment. Pet. Ex. 18 at 6. Petitioner sought treatment on November 6, 2017, at the CVS Minute Clinic Urgent care, endorsing bilateral earache, mild congestion, a dry cough, headache, and sore throat. Pet. Ex. 9 at 7. At this appointment it was recorded that petitioner had "swollen glands about five days ago, no longer has sore throat, now has headache and ear congestion and facial fullness." *Id.* The examination was positive for bilateral middle ear effusion. *Id.* at 8. The assessment was "significant for viral infection. Self-care and symptomatic treatment recommended." *Id.*

On November 13, 2017, petitioner had an appointment with Dr. Quedding-Pizarro for vertigo. Pet. Ex. 12 at 20. Under the neurological exam, it was noted that her "pupils remained dilated despite dimming the room," and it was repeated "without light." *Id.* Further, petitioner had an unsteady wide gait, and she could not do heel to toe walk. *Id.* Under "Provider Impressions," Dr. Quedding-Pizarro wrote that petitioner was going to walk to get a CT scan, but was very "unsteady, almost buckling that I had to assist her." *Id.* At 21. Petitioner was sent to the emergency department of Ahuja Medical Center. In the emergency department, petitioner reported that she was having double or triple vision and felt very unsteady walking. Pet. Ex. 2 at 39. Her neurological exam showed she was "positive for dysmetria, truncal ataxia, ataxic gait," and she had "proprioception disturbance with heel to shin movement," and she was "so unsteady

she was unable to perform a Romberg test." *Id.* At 40.  Petitioner was discharged from the hospital the next day, still with unsteady gait.

Petitioner had an appointment with ENT, Dr. Bert Brown on November 16, 2017 Pet. Ex. 15.  Petitioner complained of dizziness, light-headedness, imbalance, and room spinning.  *Id.* at 1.  Petitioner also indicated that she had double vision.  *Id.*  Petitioner's dizziness had been present for four weeks and developed suddenly.  *Id.*  When vestibular maneuvers were performed, petitioner had disconjugated gaze, an abnormal Romberg test, an abnormal gait, and bilateral dysdiadochokinesia.  *Id.* at 4.  The impression was dizziness.  *Id.*

Petitioner was referred to neurologist Dr. Winer by Dr. Brown, and had an appointment on November 16, 2017.  Pet. Ex. 10 at 14.  Petitioner reported that she was recently hospitalized at Ahuja Medical Center.  *Id.* Petitioner reported that she had "symptoms of an upper respiratory infection and perhaps UTI."  *Id.*  She developed horizontal diplopia five days ago, which would be on November 11, 2017.  *Id.*  Petitioner also had an unsteady gait and some generalized weakness with dizziness.  *Id.*  Dr. Winer wrote, "Did have flu shot 4 weeks ago and possible upper respiratory infection 2 weeks ago."  *Id.*  Petitioner's strength was normal.  The exam of her cranial nerves revealed, "Questionable mild bilateral ptosis and left sixth nerve palsy (subjective the horizontal diplopia with left lateral gaze," and she had mild bilateral facial weakness.  *Id.* at 16.  Petitioner did have areflexic deep tendon reflexes and an ataxic gait.  *Id.*  Dr. Winer wrote:

> History of a flu shot 4 weeks ago and upper respiratory infection 2 weeks ago.
> Neurologic exam is […] most consistent with Miller Fisher variant of Guillain-Barre
> syndrome.  She has plateaued neurologically and I think it is safe to manage her as an
> outpatient.

*Id.* at 17.  Dr. Winer recommended petitioner have oral corticosteroids and noted that her MRI was normal.  *Id.*  He also indicated that he was going to perform an EMG and nerve conduction study at a re-evaluation in 3-4 days.  *Id.*

Petitioner had follow-ups with Dr. Winer on November 21, 2017.  Pet. Ex. 10 at 11. Petitioner reported that her balance had improved somewhat and she noticed less double vision. *Id.*  Petitioner did not have any problems with chewing or swallowing and no muscle weakness. *Id.*  The cranial nerve exam showed that petitioner had "bilateral ptosis and external ophthalmoplegia (cannot abduct left eye beyond midline)," and "mild bilateral facial weakness." *Id.* at 13.  Her deep tendon reflexes were areflexic and she had a mildly ataxic gait.  *Id.*  Dr. Winer indicated that petitioner was "slightly better with respect to balance" but her ophthalmoplegia was still the same and that petitioner still was areflexic.  *Id.* He recommended a follow-up in two-to-three weeks.  *Id.*

At her next follow-up with Dr. Winer on December 12, 2017, petitioner's gait was "much improved," and she indicated that she had "no problems with balance and no problems with walking."  *Id.* at 7.  However, petitioner indicated that her diplopia and ophthalmoplegia were still problematic.  *Id.*  The physical exam revealed that petitioner still had left eye external ophthalmoplegia and bilateral ptosis.  *Id.*  Petitioner also still had absent deep tendon reflexes,

but her ataxic gait had improved.  *Id.* at 9.  Dr. Winer recommended that petitioner have a consultation with a neuro-ophthalmologist.  *Id.*

On March 15, 2018, petitioner had another follow-up with Dr. Winer.  Pet. Ex. 10 at 3. Petitioner denied any problems with walking and had no problems falling.  *Id.* Dr. Winer noted that petitioner "has made almost a full recovery," but petitioner was still experiencing some mild intermittent diplopia and quivering of her eyebrows.  *Id.*  Her cranial nerve testing was documented as "normal," but she still had absent deep tendon reflexes.  *Id.* at 5.  Further, petitioner's motor strength was normal in both her upper and lower extremities.  *Id.*  Dr. Winer again referred petitioner to a neuro-ophthalmologist for her residual vision issues.  *Id.* at 6.  Dr. Winer's impression was, "The patient has made "posterior full recovery" from Guillain-Barre syndrome; Does have some residual visual symptoms; I still like her to see the neuro-ophthalmologist."  *Id.*

Four and a half months after the onset of her symptoms, on March 29, 2018 petitioner had an appointment with neuro-ophthalmologist, Dr. Michael Morgan.  Pet. Ex. 11 at 2.  Under "Chief Complaint/Reason for Visit," Dr. Morgan wrote that petitioner was referred for Miller-Fisher variant of Guillain-Barre syndrome diagnosed in November 2017.  *Id.*  Petitioner "states had diplopia at onset, resolved 2 months ago, with eyes 'turning out/in' until January 2018, c/o rare headache top of head, vis[ion] stable, denies flashes/floaters."  *Id.*  Then the medical record provides:

> This 26-year old woman with a history of Miller-Fisher variant of GBS 11/2017…presents for evaluation of diplopia.  [She] experienced new onset diplopia following influenza vaccination and presumed upper respiratory viral illness 11/2017 with evaluation at Ahuja.  She subsequently saw neurologist Dr. Norton Winer who diagnosed Miller Fisher syndrome.  The diplopia resolved in early 2/2018.  She has had eyelid twitching and some pain behind her eyes earlier in the week.

*Id.* at 3.  The examination of her eye measured her eye pressure of her right eye at 17 and her left eye at 19 (normal).  After a full examination of petitioner, Dr. Morgan wrote:

> This 26-year-old woman with a history of Miller Fisher variant of GBS 11/2017…presents for evaluation of diplopia.  Diplopia has resolved, and examination now is remarkable only for light near dissociation of the pupils, possibly residual parasympathetic/CN III damage versus a normal variant.  Other considerations such as ocular myasthenia gravis seems less likely with the history of a monophasic illness.

*Id.* at 5.  Dr. Morgan recommended that petitioner follow-up for recurrent diplopia or other vision problems.  *Id.*

From June 19, 2018 to July 17, 2018, petitioner was being treated at Chagrin Chiropractic for "sprain of sacroiliac joint, low back pain, muscle spasm of the back, and cervicalgia."  Pet. Ex. 8 at 13.  The record begins with an appointment from June 19, 2018, and it was recorded as her sixth visit.  *Id.* at 12.  At the June 19, 2018 appointment petitioner's "Chief Complaints" were "tightness/stiffness and aching discomfort to the lumbar, left sacroiliac, left posterior

pelvis/hip and left buttock." *Id.* at 12. She also reported "aching, burning and annoying discomfort to the posterior cervical (neck) and aching and burning in her upper thoracic spine." *Id.* Petitioner was receiving manipulative treatment and low-volt EMS treatment on the lumbar, left sacroiliac and right sacroiliac regions. *Id.* Petitioner indicated that using the computer for longer than one hour and 30 minutes aggravates her lumbar spine and hips. *Id.* at 8. The last appointment included in this record is from July 17, 2018, when petitioner reported that she was recently hospitalized for cellulitis after having 3 moles removed. *Id.* The record does not include any reports of dizziness, difficulty walking, balance issues, or twitching.

The next medical record is from July 5, 2018, when petitioner was hospitalized for an infection/cellulitis on her right arm after having a mole removed. Pet. Ex. 13 at 22; *see also* Pet. Ex. 26 at 87. The Review of Systems indicated that she had no vision loss or double vision. Pet. Ex. 26 at 87. The physical exam noted that her cornea and anterior chamber were clear. *Id.* at 88. Her neurological exam noted that she had normal finger-nose testing, normal sensation, no focal weakness, and no focal/lateralized findings either. *Id.* During petitioner's hospitalization, Dr. Mark Salomone had a consult with petitioner and under Review of Systems, petitioner was "negative" for blurry vision, diplopia, or vision/loss or change." *Id.* at 99. Petitioner was also examined by Dr. Lemonovich, an infectious disease physician, on July 5, 2018. *Id.* at 106. Under "Past Medical History"her note provided, "Guillain-Barre syndrome attributed to influenza vaccine 11/2017, has some residual intermittent diplopia." *Id.* Petitioner was discharged from the hospital on July 9, 2018.

Petitioner had a follow-up with Dr. Lemonovich on July 20, 2018, for her right arm cellulitis. Pet. Ex. 13 at 6. This note indicates that petitioner returned to work and her energy level was "back to normal." *Id.* At this appointment, petitioner denied any vision problems and she denied any limb weakness. *Id.* at 7. Petitioner apparently was exercising on the treadmill and cycling, along with weight training. *Id.* at 8.

On September 24, 2018, petitioner had an appointment with Dr. Amelita Quedding-Pizarro for medication refills, a TB test, and a letter exempting her from the flu shot. Pet. Ex. 12 at 10. Petitioner denied dizziness and muscle aches or joint pains. *Id.* The physical exam of her eyes showed that her extra ocular movements were intact, and her neurological examination indicated that petitioner was "alert, oriented, cranial nerves II-XII intact except for visual acuity." *Id.* at 13. Petitioner's gait was recorded as normal and steady. *Id.*

Eleven months later, on August 16, 2019, petitioner had a follow-up appointment with Dr. Amelita Quedding-Pizarro. Pet. Ex. 12 at 5. Petitioner indicated for the first time that she was experiencing extreme fatigue. *Id.* Petitioner reported no dizziness or headaches. *Id.* Her physical exam indicated that her gait was normal and steady, and she had full range of movements in her upper and lower extremities. *Id.* at 8. Again, her cranial nerves were noted as "intact, except for visual acuity." *Id.* Dr. Quedding-Pizarro ordered a complete blood count for petitioner's fatigue. *Id.* at 8. Petitioner returned to Dr. Quedding-Pizarro on October 18, 2019 for a follow-up for her fatigue. *Id.* at 1. Petitioner reported that she was working out 5-6 times a week and she has "been doing better," but still "sleepy sometimes when driving." *Id.* Again, petitioner denied dizziness. *Id.* Petitioner still had a normal gait and full range of movement in

her upper and lower extremities. *Id.* Petitioner was diagnosed with low vitamin D levels and Dr. Quedding-Pizarro recommended that petitioner take a vitamin D supplement. *Id.* at 4.

The next record petitioner filed was from September 2023. Pet. Ex. 25. Petitioner's appointment was for a preventative health examination and follow-up for her low vitamin D levels. *Id.* at 1. Apparently, petitioner had a left arm strain and she had some virtual visits as her insurance provided a tablet for those. *Id.* Under "Provider Impressions" petitioner had hormonal migraines and was taking Excedrin, and petitioner still had low vitamin D levels. *Id.* Under "History of Present Illness," it was also noted that petitioner receives routine vision care. *Id.* The physical exam showed that petitioner had symmetrical deep tendon reflexes and motor strength was 5/5 and symmetric. *Id.* at 4. Again, her cranial nerves were listed as "intact except for visual acuity." *Id.* Petitioner had a normal and steady gait.

**b. Petitioner's affidavits**

Petitioner filed three affidavits in this matter. *See* Pet. Exs. 19, 22 & 24. In all three affidavits, petitioner states that she was in good health prior to receiving the flu vaccine on October 18, 2017. Pet. Ex. 19 at ¶ 5; Pet. Ex. 22 at ¶ 3; Pet. Ex. 24 at ¶ 5. In all three affidavits, petitioner also states that "within a week of receiving the Fluarix Quadrivalent vaccine, I began to experience the following symptoms: swollen glands, sore throat, headache, earache." Pet. Ex. 19 at ¶ 10; Pet. Ex. 22 at ¶ 7; Pet. Ex. 24 at ¶ 10. On November 6, she reports the same symptoms but adds pain and double vision. On November 13, she indicates that she had vertigo and very large pupils. Additionally, all three affidavits indicate that she was diagnosed with Guillain-Barre syndrome by Dr. Norton Winer on November 16, 2017. Pet. Ex. 19 at ¶ 16; Pet. Ex. 22 at ¶ 9; Pet. Ex. 24 at ¶ 16.[3]

Petitioner states in the three affidavits, the first of which was signed on May 1, 2021 that because of her MFS-GBS diagnosis, she "continues to experience chronic fatigue, intermittent nerve pain, and twitching at night when tired/falling asleep." Pet. Ex. 19 at ¶ 17; Pet. Ex. 22 at ¶ 10; Pet. Ex. 24 at ¶ 17. In the affidavit signed on January 18, 2024, petitioner stated that she has "no reflexes" and she has muscle twitching because of the Miller-Fisher GBS, along with blurry vision. Pet. Ex. 24 at ¶ 19. Furthermore, petitioner stated that "she cannot stand for longer than 30 minutes without taking a break," and that she has a difficult time walking up and down the stairs and trouble with her balance. *Id.* Petitioner stated that, "To date, I still suffer from blurry vision, double vision, reflex issues, and poor muscle control." *Id.* at ¶ 18.

The earlier signed affidavits endorse similar symptoms. For example, in the affidavit signed on November 8, 2023, petitioner noted that she experiences chronic fatigue, struggled with balance issues, and pain in her neck and lower parts of her body. Pet. Ex. 22 at ¶¶ 12-14. In her affidavit signed on May 1, 2021, petitioner stated that she "cannot go down the stairs alone and I must scoot down the steps and hope for the best," and that she "cannot do normal everyday activities without assistance." Pet. Ex. 19 at ¶ 18. She also endorsed chronic fatigue, intermittent nerve pain, and twitching at night as of May 2021. *Id.* at ¶ 17.

---

[3] It is noted that both Exhibit 19 and Exhibit 24 indicate that petitioner was diagnosed on November 16, 2018. This appears to be a scrivener's error and the medical records are consistent with a diagnosis of MFS-GBS by Dr. Winer in November 2017.

### c. Affidavits from Mr. Peter Shanes and Mrs. Lisa Shanes

Petitioner's parents, Mr. Peter Shanes and Mrs. Lisa Shanes, also signed affidavits to explain petitioner's condition and symptoms. Pet. Exs. 20 & 21. In both of these affidavits, the date of petitioner's vaccination is wrong, putting it at October 17, 2018 instead of October 18, 2017. In fact, the affidavits from Mr. Peter Shanes and Mrs. Lisa Shanes are identical.

Both Mr. and Mrs. Shanes state that they "personally observed the following health-related issues [petitioner] began to experience after receiving the October [18, 2017] vaccination: a) loss in vision; b) difficulty walking; c) fatigue; and d) vertigo." Pet. Exs. 20 & 21 at ¶ 10. Further, both state that, "As a consequence of the health-related issues [petitioner] began to experience after receiving the [October 18, 2017] vaccination, [petitioner] was no longer able to engage in a wide variety of activities [she] regularly enjoyed doing prior to receiving the vaccination." *Id.* at ¶ 11.

Additionally, they both stated, "Since the vaccination and the subsequent health related difficulties, [petitioner] is now faced with emotional and physical limitations depending on her fatigue that day to do the things she loves." *Id.* at ¶ 2.

In their second combined affidavit, signed on November 16, 2023, both state that "all of the following is based on our personal knowledge and observation of [petitioner]. Below is the information that was provided by [petitioner]. Lisa and Peter are both in agreement with the below information; Numbers 3-16." Pet. Ex. 23 at ¶ 2.

Paragraphs 3-16 are identical to the paragraphs that appear on petitioner's second affidavit. Pet. Ex. 23; *see also* Pet. Ex. 22.

## IV.    Discussion and Findings of Fact

There is no doubt that petitioner was diagnosed with the Miller-Fisher variant of GBS on or around November 16, 2017 by Dr. Winer. *See* Pet. Ex. 5 at 17. Additionally, respondent concedes that petitioner satisfied the criteria in the Vaccine Injury Table and the Qualifications and Aids to Interpretations for a flu/GBS MFS Table injury. Resp. Rept. at 7. There is also no question that her symptoms began after receipt of the vaccination. Thus, the only factual issue is whether petitioner's symptoms or residual problems attributable to GBS continued for longer than six months, a requirement for a claim to be compensable in the Vaccine Program. *See* 42 U.S.C. § 300aa-11.

For petitioner to demonstrate the severity requirement, she would have to demonstrate that her symptoms lasted through at least May 13, 2018. She had symptoms of sore throat, headache and congestion on November 6, but these were diagnosed as a viral illness. It was not until her appointment with Dr. Quedding-Pizarro and a subsequent neurological exam on November 13, when symptoms of MFS-GBS were documented- truncal ataxia, ataxic gait, dysmetria, proprioception difficulty and double vision. Accordingly, I conclude that the petitioner demonstrated symptoms of Miller Fisher/GBS by November 13, 2017. As such she

would have to demonstrate ongoing symptoms or residual deficits through at least May 13, 2018. After a review of petitioner's medical records and the multiple statements submitted by petitioner and her parents, I find that petitioner has not established that she experienced residual symptoms of her MFS-GBS for six-months or longer by preponderant evidence.

Importantly, when petitioner was diagnosed with MFS-GBS, her symptoms included ataxia, balance issues, double vision (diplopia), dysmetria, and areflexia. *See* Pet. Ex. 5 at 16. At her final appointment with neurologist, Dr. Winer on March 15, 2018, his assessment indicated that petitioner's gait had improved, she had no problem walking, she had "mild intermittent diplopia and quivering eyebrows when tired," and he noted that she still had absent deep tendon reflexes. *Id.* at 5. Her motor strength was normal in both upper and lower extremities. Dr. Winer wrote that petitioner had made a "posterior full recovery from GBS syndrome," but that she had "some residual symptoms," and he referred her to a neuro-ophthalmologist. *Id.* at 6.

Petitioner had an appointment with neuro-ophthalmologist, Dr. Morgan, on March 29, 2018--approximately four and a half months after the onset of her GBS symptoms. Dr. Morgan noted petitioner's history of a flu vaccination and viral illness in November 2017 and her diagnosis of Miller Fisher/GBS. Pet. Ex. 11 at 2-3. He conducted an examination that noted normal pressures (17 and 19) and that petitioner's diplopia had resolved, and the only visual issue was "light near dissociation of the pupils," and opined that it was either "possibly residual parasympathetic/CN III nerve damage versus normal variant." *Id.* at 5. He recommended that she follow-up with him if she experienced any other visual problems. *Id.* Petitioner did not file any additional records from a neurologist, neuro-ophthalmologist, ophthalmologist, or any other provider that documented the existence of the symptoms she experienced that can be associated with her MFS-GBS. She did not follow-up with Dr. Morgan.

However, petitioner did have multiple appointments in June and July 2018 with a chiropractor for cervical, thoracic and mostly lumbar back pain which was aggravated by sitting at the computer and for which she received chiropractic manipulation. *See* Pet. Ex. 8. There is no indication that these back pains were related to her MFS/GBS and she did not report any visual or balance issues.

The medical records show that by March 2018 petitioner was no longer experiencing gait disturbances. At her last documented appointment with neurologist Dr. Winer, petitioner "denied any problems with walking or ambulation," and that petitioner was driving without difficulty. Pet. Ex. 10 at 3. These reports appear to contradict what petitioner asserted in her affidavit in which she claimed that she has struggles with balance issues since 2017. *See* Pet. Ex. 22 at ¶ 11. Additionally, the cranial nerve exam he performed that day was normal and Dr. Winer wrote that petitioner's "gait/station examination within normal limits." *Id.* When petitioner was assessed in the hospital for her right arm cellulitis on July 5, 2018, Dr. Mark Salomone examined the petitioner and wrote, "Neurological: alert and oriented x3, intact senses, motor, response and reflexes, normal strength." *Id.* at 101. Furthermore, when Dr. Quedding-Pizarro saw petitioner in September 2018, she recorded that petitioner had full range of movement symmetrically in her upper and lower extremities and petitioner's gait was normal and steady. *See* Pet. Ex. 12 at 13.

With respect to petitioner's diplopia, which petitioner experienced at the onset of her MFS-GBS, the records are more varied as to how long this symptom remained, but petitioner argues that the lone notation from Dr. Lemonovich, an infectious disease physician made in July 2018, is sufficient to meet the severity requirement. However, reliance on this lone notation contradicts petitioner's own reports to neuro-ophthalmologist, Dr. Morgan, and a physical examination from him on March 29, 2018. Under "Chief Complain/Reason for Visit," Dr. Morgan wrote, "pt referred for Miller-Fisher variant Guillain-Barre syndrome, dx'd 11/17; states had diplopia at onset, resolved 2 months ago, w/ eyes "turning out/in" until January/2018…vis stable, denies flashes/floaters." Pet. Ex. 11 at 3. The record continued, providing:

> ….experienced new onset diplopia following influenza vaccination and presumed upper respiratory viral illness 11/2017 with evaluation at Ahuja. She subsequently saw neurologist Dr. Norton Winer who diagnosed Miller-Fisher syndrome. The diplopia resolved in early 2/2018. She has had eyelid twitching and some pain behind her eyes earlier in the week.

*Id.* After Dr. Morgan performed the physical exam of her eyes, he again reiterated that petitioner's diplopia had resolved, and petitioner was only remarkable for light near dissociation of the pupils. *Id.* at 5. When petitioner went to the emergency room on July 4, 2018, for an infection on her right arm after having moles removed, she reported that she did not have any double vision or eye pain. Pet. Ex. 26 at 362. The next day, when she returned to the emergency room for continued right arm pain, the "Review of Symptoms," under the "Eyes" section, states, "NEGATIVE: Blurry vision, drainage, diplopia, redness, vision loss/change." *Id.* at 99. Dr. Salomone, noted that petitioner had a past-history of Guillain-Barré syndrome and performed a full physical examination, in which petitioner's eye exam was normal. *Id.* During petitioner's admission, Dr. Lemonovich, the infectious disease specialist did record under "Past Medical History: Guillain-Barré syndrome attributed to influenza vaccine 11/2017, has some residual intermittent diplopia." *Id.* at 106. However, when petitioner had a follow-up with Dr. Lemonovich on July 20, 2018, following her hospitalization for sepsis and right arm cellulitis, petitioner reported that she did not have any vision problems or loss and she also denied limb weakness. Pet. Ex. 13 at 6-7.

This lone notation from Dr. Lemonovich made on July 5, 2018 is not sufficient to meet the six-month severity requirement on its own, particularly as it was not a condition for which Dr. Lemonovich was treating the petitioner and Dr. Lemonovich did not test petitioner's vision. Notably, Dr. Lemonovich declined to provide an expert report on this issue. *See* Pet. Status Rept. (ECF No. 51) ("Dr. Lemonovich recently declined to provide a report because she was not the diagnosing physician."). Furthermore, the report of residual intermittent double vision by Dr. Lemonovich, was likely was just a notation of a history provided by petitioner, directly contradicts petitioner's other statements to physicians and nurses during that same hospitalization that she *did not* have diplopia. *See* Pet. Ex. 26 at 99 (negative for diplopia). "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *See Murphy v. Sec'y of Health & Human Servs.,* no. 90-882V, 1991 WL 74931, at * 4 (Fed. Cl. Spec. Mstr. Apr. 25, 1991); *see also Campbell ex rel. Campbell,* 69 Fed. Cl. 775 (2006). Petitioner's contradictory mention of residual, intermittent

double vision to Dr. Lemonovich is inconsistent with other records from the same hospitalization which included normal neurological evaluations and also contradicts the separate medical record from neuro-ophthalmologist, Dr. Morgan who found that petitioner's diplopia had resolved after a full examination. *See* Pet. Ex. 11 at 5. Thus, the notation of history from Dr. Lemonovich is afforded little weight.

Petitioner's assertions that her fatigue was a residual symptom of her MFS-GBS is also not supported by the record. As respondent observed in the Rule 4(c) report, petitioner first reported her fatigue to Dr. Quedding-Pizzaro in August 2019, approximately twenty months after her diagnosis of MFS-GBS. Resp. Rept. at 8; *see also* Pet. Ex. 12 at 4 (Chief Complaint: Check-up needs refills and extreme fatigue). Dr. Quedding-Pizzaro diagnosed petitioner with fatigue and ordered a complete blood count which revealed a vitamin D deficiency. *Id.* at 4. Nowhere in the medical records between her diagnosis of MFS-GBS in November 2017 and August 2019 did petitioner report that she was experiencing fatigue and none of her treating physicians associated her fatigue in 2019 to her previously diagnosed MFS-GBS. Under the severity requirement of the Vaccine Act, residual effect, illness, disability, injury, or condition are something remaining or left behind by the vaccine injury, including lingering signs and symptoms of the original vaccine injury. *Wright v. Sec'y of Heath & Human Servs.,* 22 F.4th 999, 1006 (Fed. Cir. 2022). In this case, petitioner's treating physician associates the fatigue to a vitamin D deficiency and was a new condition that began in 2019, not as a residual symptom of her MFS-GBS, and therefore cannot be considered a residual condition or symptom of the original vaccine injury.

Similarly, petitioner's alleged ongoing twitching as a residual symptom of MFS-GBS is also unsupported by the medical record. First, her affidavits are unclear as to what part of her body is twitching uncontrollably. When petitioner was initially diagnosed with MFS-GBS, Dr. Quedding-Pizzaro wrote that petitioner had "Miller Fisher variant of GBS, due to flu shot and viral infection; at night twitching and pains." Pet. Ex. 12 at 18. The next time "twitching" was noted in the medical records was by Dr. Morgan who noted that petitioner had eyelid twitching, but not full body twitching. *See* Pet. Ex. 11 at 3. Petitioner never reported this symptom to her neurologist, Dr. Winer, and he also did not record "twitching" as something he observed when he examined her. The final time "twitching" appeared in the record was from a September 15, 2023 appointment, five years after her appointment with neurologist, Dr. Winer, with Dr. Quedding-Pizzaro who wrote, "post-status GBS balance is fair, no falling, still with twitching no vaccines." Pet. Ex. 25 at 1. The reports of twitching petitioner made to her providers when she was being seen for MFS/GBS in 2017-2018 especially her eye-lid twitching, could be consistent with MFS-GBS. However, the wide gap in the medical records between when petitioner reported twitching at that time and the later notation by Dr. Quedding-Pizzaro calls into question the present claim for nighttime twitching which petitioner now claims is so severe that her husband cannot sleep in the same bed with her. Instead, petitioner's physical therapy records from June 2018 indicate that petitioner's sleeping difficulty is associated with her lumbar spinal issues and left hip and pelvic pain. *See* Pet. Ex. 8 at 10. Finally, the reference in the records of relating to twitching are associated with petitioner's eyebrows and eyes and does not document extensive twitching of other body part and the lone notation from Dr. Quedding-Pizzaro in September 2023 is not specific as to the location of the twitching.

However, finding that petitioner did not meet the severity requirement in this matter is not based on the medical records alone. Petitioners are able to supplement the evidentiary record with sworn statements or statements from third-parties, as finding that petitioner has met the severity requirement cannot be based on petitioner's word alone. § 13(a)(1); *Colon v. Sec'y of Health & Human Servs.* 156 Fed. Cl. 534, 541 (2021); *see also Kohl v. Sec'y of Health & Human Servs.,* No. 16-748V, 2022 WL 4127217 (Fed. Cl. Spec. Mstr. Aug. 18, 2022) (allowing petitioner to submit third-party statements and timesheet to supplement the evidentiary record). But "where later testimony conflicts with earlier contemporaneous documents, courts generally give the contemporaneous documentation more weight." *Campbell ex rel. Campbell v. Sec'y of Health & Human Servs.,* 69 Fed. Cl. 775, 779 (2006). The affidavits and statements from petitioner's parents are afforded little weight, as they do little to explain the lack of treatment for alleged residual symptoms of her MFS-GBS from March 2018 to September 2023 and instead allege broad limitations to her activities of daily living that are wholly unsupported in the medical records.

Petitioner's affidavits allege that she "cannot do normal everyday activities without assistance," "cannot go down the stairs alone" and "must scoot down the steps and hope for the best," and "cannot cook on her own." Pet. Ex. 19 at ¶ 18. She also asserted that she continued to suffer from "blurry vision, double vision, and reflex issues." Pet. Ex. 24 at ¶ 18. However, these statements stand in stark contrast to what she was reporting to her treating physicians more proximately to her diagnosis and contradict the later medical records. For example, when she had an appointment with neurologist Dr. Winer on March 15, 2018, Dr. Winer wrote that petitioner "denies any problems with walking or ambulation," and had "no problems falling." Pet. Ex. 10 at 3. Additionally, petitioner reported that she was driving and has no difficulty. *Id.* At an appointment on October 18, 2019, petitioner reported that she was "exercising 5-6 times a week." Pet. Ex. 12 at 4. Additionally, Dr. Quedding-Pizarro recorded that petitioner had a normal, steady gait and petitioner had full range of movement in her extremities. *Id.* The most recent medical record petitioner filed, which was from an appointment on September 15, 2023, Dr. Quedding-Pizarro recorded that petitioner's deep tendon reflexes were 3+ and symmetrical and her motor strength was 5/5 and symmetrical. Pet. Ex. 25 at 4. Dr. Quedding-Pizarro also noted that petitioner's gait was normal. *Id.* It is difficult to reconcile petitioner's statements of significant deficits in her functions impairing many of her activities with the medical records and what she was reporting to her physicians. At best, her affidavits exaggerate her initial symptoms and then attempt to tie in unrelated issues, such as fatigue which was diagnosed two years later and associated with a Vitamin D deficiency, to meet the severity requirement.

The affidavits from petitioner's parents, Mr. Peter Shanes and Mrs. Lisa Shanes, do not provide support for petitioner's assertion that her symptoms lasted six-months or longer. These statements lack credibility they parrot petitioner's own statements in her affidavits, and they lack any specificity with regard to the timeframe of petitioner's symptoms or the residual deficits they personally witnessed. For example, Mr. Peter Shanes' affidavit stated, "Since the vaccination, and the subsequent health related difficulties, [petitioner] is now faced with emotional and physical limitations depending on her fatigue that day to do the things she loves." Pet. Ex. 20 at ¶ 12. In the second affidavit filed by Mr. Peter and Mrs. Lisa Shanes, they explicitly attest that the information provided in the affidavit was from petitioner and paragraphs 3-16 are identical to the statements in petitioner's supplemental affidavit signed on November 8, 2023. Neither

parental affidavit contains any independent observations or recollections of impairments suffered by the petitioner.

Treatment gaps are not uncommon in Vaccine Cases, as there can be many reasons that petitioners may not seek medical attention for an injury or are unable to seek the care they need. *See Law v. Sec'y of Health & Human Servs.,* No. 21-699V, 2023 WL 2641502, at*5 (Fed. Cl. Spec. Mstr. Feb. 23, 2023) ("A treatment gap…does not automatically mean severity cannot be established."); *see also Tackett v. Sec'y of Health & Human Servs.,* No. 20-1705, 2023 WL 6995391, at * 9 (Fed. Cl. Spec. Mstr. Sept. 25, 2023) (petitioner discontinued physical therapy appointments just short of six-months due to restrictions during the COVID-19 pandemic); *Sawyer v. Sec'y of Health & Human Servs.,* No. 19-1473V, 2023 WL 4505208, at * 5 (Fed. Cl. Spec. Mstr. June 12, 2023) (finding that petitioner met the severity requirement because the treatment gap was due to temporary relief provided by a steroid injection); *Yost v. Sec'y of Health & Human Servs.,* No. 18-288V, 2021 WL 2326403, at *12 (Fed. Cl. Spec. Mstr. May 6, 2021) (finding onset of a vaccine-related injury despite a delay in seeking treatment for three months because petitioner was finishing a semester of school).   Petitioners can overcome gaps in treatment to demonstrate the ongoing existence of a condition by providing clear and cogent statements or testimony that do not conflict with medical records.  *Sanchez v. Sec'y of Health & Human Servs.,* No. 11-685V, 2013 WL 18880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013). Additionally, there is no presumption that medical records are complete and accurate as to all physical conditions.  *Kirby v. Sec'y of Health & Human Servs.,* 997 F.3d 1378, 1383 (Fed. Cir. 2021).  Testimony that conflicts with contemporaneously created medical records, however, should be afforded little weight.  *Cucuras,* 993 F.2d at 1528.  Furthermore, there must be evidence beyond a petitioner's word alone, such as other corroborating records or reports to establish the severity requirement by a preponderance of evidence.  *See Colon v. Sec'y of Health & Human Servs.,* 156 Fed. Cl. 534, 541 (Fed. Cl. 2021).

In *Kirby,* the petitioner had two months of persistence symptoms after vaccination, but then the medical records were silent for two years regarding ongoing shoulder pain.  *Kirby,* 997 F.3d 1378, 1383.  The petitioner overcame the silence in the records by 1) providing clear and compelling testimony that during that time period she was performing home exercises and produced the home exercise sheets; 2) reported to a nurse practitioner about ongoing shoulder pain that began after vaccination two years ago and 3) provided expert testimony about intermittent pain that was consistent with petitioner's specific shoulder injury.  *Id.* at 1382.  The Federal Circuit explained that the petitioner's testimony did not conflict with the medical records, which were silent as to the existence of the ongoing shoulder pain and that such silence could be explained by the fact that the petitioner had exhausted all available treatment.  *Id.* at 1382-83.

Unlike in *Kirby,* where the medical records were silent as to petitioner's ongoing residual symptoms related to her vaccine-induced injury, the records in this case include affirmative notations negating the existence of residual symptoms of petitioner's vaccine induced MFS-GBS.  *See Kirby,* 1383.  Dr. Morgan, neuro-ophthalmologist, after a full examination, concluded that petitioner's diplopia had resolved consistent with the petitioner's own report to him.  *See* Pet. Ex. 11 at 5.  While being treated for cellulitis in July 2018, petitioner was recorded as having normal strength, normal intact reflexes and responses and no dizziness.  Pet. Ex. 26 at 100-01.

Additionally, in September 2023, at her annual physical appointment with Dr. Quedding-Pizarro, her reflexes were recorded as 3+ and symmetrical and petitioner had normal strength and reported that she was negative for dizziness, weakness, and visual changes. Pet. Ex. 25 at 2, 4. These records contradict petitioner's statements in her affidavits where she asserts that she continues to suffer from blurry vision, double vision, reflex issues, and poor muscle control. Further, this record is the *only* annual examination that petitioner filed in this matter, despite asserting that she attends annual check-ups regularly. *See* Pet. Ex. 22 at ¶ 16 ("I have had absent reflexes which have been documented in every yearly checkup that I have had since being diagnosed with Guillain-Barré syndrome in November 2017"). Additionally, the records do not demonstrate that petitioner sought treatment for *any* of her alleged residual MFS-GBS symptoms after March 29, 2018, even though she did seek treatment for back pain from a chiropractor and for cellulitis for which she was hospitalized.

To meet the severity requirement, the petitioner must show by preponderant evidence that she "suffered the residual effects or complications of such illness, disability, injury, or condition for more than six months after the administration of the vaccine." § 300aa-11(c)(D)(i). Finding that petitioner has met the severity requirement cannot be based on petitioner's word alone, though a special master need not base his or her finding on medical records alone. § 300aa-13(a)(1); *see also Colon v. Sec'y of Health & Human Servs.,* 156 Fed. Cl. 534, 541 (2021). The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe v. Sec'y of Health & Human Servs.,* 110 Fed. Cl. 184, 204 (2013), *aff'd* 746 F.3d 1335 (Fed. Cir. 2014).

In this case it appears that petitioner had a mild case of MFS/GBS which did not require hospitalization, IVIG, or physical therapy. Treating neurologists concluded that her symptoms had remitted by late March 2018. Petitioner's later assertion of symptoms in affidavits prepared for this case appear to be exaggerated at best as she did not seek treatment for blurry vision, severe twitching, double vision, and inability to traverse stairs over the intervening years and at times contradict the medical records which indicates that she is working out multiple times a week and driving.

Based on the record as a whole and after weighing the available evidence, I find that petitioner does not meet the six-month severity requirement. The medical records demonstrate that she suffered residual symptoms of MFS-GBS through March 2018, but not afterwards. Petitioner's statements not only associate unrelated symptoms to her MFS-GBS diagnosis, but also contradict the medical records. Finally, the statements by her parents which do not reflect their own observations, but simply repeat the exact language of petitioner's statements do not add credibility or detail to the petitioner's claims. As a result, petitioner has not demonstrated by preponderant evidence that she experienced residual effects for more than six months.

## V.    Conclusion

Upon review of the record as a whole, petitioner has failed to satisfy the severity requirement and therefore, the petition must be **DISMISSED.**

**IT IS SO ORDERED.**

**<u>s/Thomas L. Gowen</u>**
Thomas L. Gowen
Special Master